**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

**STACEY A. JEFFRIES and
RANDALL A. JEFFRIES,**

       **Plaintiffs,**

**v.**

**BIOTE MEDICAL, LLC,
WILLIAM JARROD CHAPMAN, D.O.,
LIVING WELL MEDICAL CENTER, PLLC,
and DRS. KRAJEKIAN, BROCK, HENDERSON,
DI PRISCO, & RAVELO, INC., d/b/a
THE FACIAL CENTER,**

       **Defendants.**

**Civil Action No.: 2:21-cv-00635
Judge: Irene C. Berger**

**<u>AMENDED COMPLAINT</u>**

NOW COME the Plaintiffs, Stacey A. Jeffries and Randall A. Jeffries, by counsel, Brian J. Headley, Esquire, and Headley Ballard LLC, pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure and file the following Amended Complaint seeking recovery for the personal injuries and damages that the Plaintiffs have suffered as a result of the negligent conduct of the Defendants.  In support thereof, the Plaintiffs aver as follows:

**PARTIES**

1.      Plaintiffs Stacey A. Jeffries ("Stacey") and Randall A. Jeffries ("Randall") are married adult individuals who reside in Charlton Heights, West Virginia.

2.      Defendant BioTE Medical, LLC ("BioTE"), is a foreign for-profit limited liability company organized and existing under the state laws of Texas with a principal place of business located at West Walnut Hill Drive, Suite 100, in Irving, Texas.

1

3.     BioTE is authorized to do business in the State of West Virginia, regularly and consistently conducts business in the State of West Virginia, and purposefully avails itself of the privileges of transacting business in the State of West Virginia.

4.     BioTE describes itself as "the world leader in precision hormone balance and complementary supplements for lifelong vitality and disease prevention."

5.     Through its network of approved medical providers, BioTE delivers hormone therapy and supplements to a variety of patients through its methods of "bioidentical hormone replacement therapy" to patients across the United States.

6.     Specifically, BioTE has supplied and does supply its hormone therapy, supplements, and related programs and products to medical providers and patients in the State of West Virginia.

7.     BioTE's activities within and directed toward the State of West Virginia are sufficiently consistent, purposeful, systematic, and substantial so as to confer general jurisdiction over them by the courts of West Virginia.

8.     Defendant William Jarrod Chapman, D.O., ("Dr. Chapman") is an adult individual and licensed medical professional who lives and works in the State of West Virginia.

9.     Defendant Living Well Medical Center, PLLC ("LWMC") is a West Virginia professional limited liability company that provides health care services to its patients and conducts and transacts business in Kanawha County, West Virginia.

10.    Upon information and belief, Dr. Chapman, a West Virginia citizen, is the only member of LWMC.

11.    LWMC maintains its principal place of business located at 826 Oakwood Road in Charleston, Kanawha County, West Virginia.

2

12.    At all times relevant to this Complaint, LWMC facilitated and provided medical care and treatment to Stacey Jeffries through its agents, servants, and/or employees.

13.    At all times relevant to this Complaint, Dr. Chapman was one such agent, servant, and/or employee of LWMC acting within the scope for which he was engaged.

14.    Defendant Drs. Krajekian, Brock, Henderson, Di Prisco & Ravelo, Inc. d/b/a as The Facial Center ("TFC") is a West Virginia corporation that provides health care services to its patients and conducts and transacts business in Kanawha County, West Virginia.

15.    TFC maintains its principal place of business located at 103 Station Place Way in Hurricane, Putnam County, West Virginia.

16.    At all times relevant to this Complaint, TFC facilitated and provided medical care and treatment to Stacey Jeffries through its agents, servants, and/or employees.

17.    At all times relevant to this Complaint, Dr. Chapman was one such agent, servant, and/or employee of TFC acting within the scope for which he was engaged.

18.    As described more fully below, the Defendants, individually and collectively, engaged in negligent conduct that resulted in severe and permanent injuries to the Plaintiffs.

19.    This Court has jurisdiction over the Plaintiffs' claims, as the cause of action arose through the negligent actions committed by the Defendants in Kanawha County, West Virginia, thereby conferring specific jurisdiction over each of them.

**FACTS**

**A.    Dr. Chapman's Long History of Treating Patients with BioTE Therapy.**

20.    Since as early as 2011, Dr. Chapman, through his employment at both LWMC and TFC, treated patients utilizing BioTE hormone therapy.

3

21.     At all times relevant to this Complaint, LWMC was a "Certified BioTE Legacy Partner" and a BioTE-designated "Trusted Provider."

22.     In or around late 2018 or early 2019, Dr. Chapman and one or more of his agent-employees, including, but not limited to Ms. Tina Taylor, left LWMC and joined TFC.

23.     At all times relevant to this Complaint, TFC was a "Certified BioTE Legacy Partner" and a BioTE-designated "Trusted Provider."

24.     TFC remains so designated by BioTE to this day.

25.     At all times relevant to this Complaint, Dr. Chapman and other agent-employees of both TFC and/or LWMC, including, but not limited to Ms. Taylor, attended one or more training seminars put on by BioTE regarding BioTE's hormone therapy programs.

26.     At the BioTE training seminars, Dr. Chapman and other agent-employees such as Ms. Taylor were instructed on how to provide hormone therapy to patients per the guidelines and recommendations of BioTE.

27.     One such hormone therapy that BioTE instructed Dr. Chapman and Ms. Taylor on was BioTE's hormone replacement therapy with pellets ("Pellet Therapy").

28.     As a part of BioTE's Pellet Therapy, small pellets containing hormones are subcutaneously injected into the body by way of a small incision.  The injected hormones are thereafter absorbed and dispersed throughout the body.

29.     According to BioTE protocol, when a patient is first evaluated for hormone replacement therapy, his or her blood is drawn and submitted to a third-party company for clinical analysis of various lab panel values.  These lab panels are then returned to BioTE's Trusted Providers.

30.    Notably, BioTE's hormone therapy program assigns its own suggested "normal" hormone levels.

31.    These BioTE standards are often dramatically higher than what is considered to be "normal" by the generally accepted medical standards (i.e., those that appear as the normal ranges in the results from blood testing laboratories).

32.    Because of this discrepancy, nearly all of Dr. Chapman's patients were diagnosed with low Testosterone and therefore considered viable candidates for BioTE hormone therapy.

33.    According to the sworn testimony of Ms. Taylor, BioTE further instructed its "Trusted Providers" like Dr. Chapman, LWMC, and TFC to disregard the patient's objective Testosterone lab values.

34.    Instead, per Ms. Taylor, BioTE advised its "Trusted Providers" to ultimately render their clinical determinations based solely on the patients' subjective feelings and/or reported side effects of previously-administered BioTE therapies.

35.    That is, according to Ms. Taylor, a patient's subjective complaints of any symptoms that may be attributable to low Testosterone levels was thereafter treated as such via Pellet Therapy, regardless of the objective levels of Testosterone measured in the individual's blood.

36.    As an additional aspect of BioTE's Pellet Therapy program, BioTE also created and maintained an automated online system for its Trusted Providers to utilize.

37.    Through the automated online system, Trusted Providers logged patient information that included a patient's clinical history, complaints, symptoms, and historical lab values.

38. Using a proprietary algorithm, BioTE's automated online system would then provide individualized instruction and specific recommendations on the appropriate course of BioTE treatment for each patient.

39. Upon information and belief, Dr. Chapman and other LWMC or TFC employees rarely strayed from the autonomous instructions and recommendations populated by the BioTE automated online system.

40. As such, Dr. Chapman, LWMC, and TFC rarely offered their own independent, medical judgment with respect to the general management of each BioTE patient's care.

41. Upon information and belief, BioTE's system failed to notify Dr. Chapman or any other TFC and/or LWMC employee when a patient's hormone levels were abnormally high or when patients were no longer viable candidates for the BioTE hormone therapy programs.

42. To the contrary, BioTE's systems consistently and invariably recommended that patients continued to receive additional hormone therapy.

**B.      The Defendants Injure Stacey Jeffries.**

43. In June of 2018, Stacey presented to Dr. Chapman and LWMC to undergo consideration for hormone replacement therapy.

44. At that time, BioTE's system and Dr. Chapman determined that Stacey was an appropriate candidate for hormone replacement therapy.

45. Thereafter, Dr. Chapman started Stacey on BioTE Pellet Therapy.

46. From June of 2018 through December of 2018, Stacey treated with Dr. Chapman and Ms. Taylor at LWMC.

47. From June 2018 through December 2018, Stacey received multiple rounds of BioTE pellet injections from Dr. Chapman at LWMC.

48.     Between December of 2018 and March of 2019, Dr. Chapman and Ms. Taylor left LWMC and began working for TFC.

49.     Stacey followed Dr. Chapman and Ms. Taylor to TFC.

50.     Dr. Chapman and Ms. Taylor continued Stacey's BioTE hormone therapy at TFC from March of 2019 through August of 2019.

51.      During each hormone replacement therapy session, Stacey was injected with BioTE pellets containing Testosterone and/or Estradiol.

52.     There are two main female sex hormones: Estrogen and Progesterone.  Females also produce and require a small amount of Testosterone.

53.     Significantly, however, through BioTE's Pellet Therapy, Stacey received treatment for only two of the three hormones.

54.     Stacey was not provided any Progesterone at any point in the fourteen months that she treated with Dr. Chapman at both LWMC and TFC.

55.     As a result of the BioTE Pellet Therapy, Stacey developed abnormally high levels of Estradiol and Testosterone in her blood.

56.     According to the records, Stacey's Testosterone levels had increased to more than 300 ng/dL during her BioTE treatments with Dr. Chapman, which is nearly the appropriate Testosterone level for a male, and more than six times the normal range of 8-48 ng/dL for a female. Stacey's Estradiol levels also reached as high as 73 pg/mL, which was markedly higher than the normal of 6-54 pg/mL for a post-menopausal female.

57.     Neither Dr. Chapman nor BioTE's hormone therapy system decreased or otherwise altered Stacey's Testosterone therapy or dosage.

58.    To the contrary, Stacey was repeatedly injected with BioTE pellets containing Testosterone and Estradiol on a routine basis for fourteen months.

59.    Stacey underwent BioTE Pellet Therapy with Dr. Chapman until August 27, 2019.

60.    On September 4, 2019, pathology results from a biopsied mass in Stacey's right breast revealed that she had developed Invasive Ductal Carcinoma.

61.    Subsequent testing revealed that Stacey was suffering from estrogen-positive breast cancer.

62.    Stacey learned of her cancer diagnosis on September 10, 2019.

63.    As a result of the Pellet Therapy provided to Stacey by the Defendants, Stacey maintained consistently excessive levels of Testosterone and Estradiol in her blood.

64.    Stacey developed breast cancer specifically as a result of the improper, inappropriate, unsafe, and unnecessary hormone therapy that she received from Dr. Chapman per BioTE's hormone replacement Pellet Therapy program.

65.    To treat her breast cancer, Stacey has endured bilateral mastectomies, grueling chemotherapy sessions, and extensive radiation treatment.

66.    As a result of the Defendants' individual and collective negligence, Stacey has endured the aforementioned significant cancer treatment and surgeries.  Stacey has also experienced severe and permanent injuries including, but not limited to, additional and unnecessary medical treatment, extreme pain and suffering, past and future medical expenses, severe emotional distress, embarrassment, humiliation, a loss of life's pleasures, the inability to function as a whole person, and other incidental damages.

67.	As provided by West Virginia Code § 55-7B-6, the Plaintiffs provided Dr. Chapman, LWMC, and TFC with notice of this claim and with a screening certificate of merit more than thirty days prior to filing this action.

## COUNT I – NEGLIGENCE
### Plaintiffs v. BioTE

68.	Plaintiffs incorporate Paragraphs 1 through 67 as though set forth fully herein.

69.	At all times relevant to this Complaint, BioTE owed a duty to exercise reasonable care to its consumers, including Stacey, in the design, development, manufacture, testing, inspection, promotion, distribution, labeling and/or use of its Testosterone Pellet Therapy program.

70.	At all times relevant to this Complaint, BioTE owed a duty to exercise reasonable care to its consumers, including Stacey, and to ensure the safety and efficacy of its products, therapies, and programs.

71.	At all times relevant to this Complaint, BioTE owed a further duty to ensure that all of its "Certified BioTE Legacy Partners" and "Trusted Providers" were appropriately trained and instructed and to ensure that all such providers rendered safe and proper hormone therapies.

72.	BioTE breached its duties to Stacey by in numerous ways, which include, but are not limited to, the following:

a.	In the negligent design, development, research, promotion, testing, marketing, implementation, and/or distribution of its hormone therapy programs, to specifically include its Pellet Therapy hormone replacement program and its attendant automated online system and patient database;

b.	In the negligent post-market surveillance of its Pellet Therapy program and online automated patient database which, if properly performed, would have shown that

9

Stacey's Testosterone and Estradiol levels were abnormally high and that she was not an appropriate candidate for the BioTE Pellet Therapy program; and

c. In failing to properly train, supervise, and/or otherwise monitor the actions of "Certified BioTE Legacy Partners" and "Trusted Providers," to specifically include Dr. Chapman, LWMC, TFC, and all agent-employees of LWMC and/or TFC, who rendered care under the applicable BioTE programs.

73. BioTE knew or should have known that the end-users of its programs and products, such as Stacey, would foreseeably suffer injuries from the Defendants' failure to exercise reasonable and ordinary care.

74. As a direct and proximate cause of BioTE's actions and inaction, Stacey suffered the injuries and damages as previously described herein.

75. BioTE's conduct was willful, wanton, and displayed a level of indifference to Stacey's health and well-being such that an award of punitive damages is appropriate.

## COUNT II – FAILURE TO WARN
### Plaintiffs v. BioTE

76. Plaintiffs incorporate Paragraphs 1 through 75 as though set forth fully herein.

77. BioTE receives compensation for every patient who is enrolled in its Pellet Therapy program.

78. Further, BioTE is compensated for every individual treatment received through its Pellet Therapy program.

79. BioTE has engaged in the business of selling, distributing, supplying, marketing, and/or promoting its Pellet Therapy program and, through that conduct, has knowingly and intentionally placed such programs into the stream of commerce with full knowledge that its product reaches consumers such as Stacey.

10

80.    BioTE did, in fact, sell, distribute, supply, market, and/or promote its Pellet Therapy program to Stacey through BioTE's "Trusted Providers," including, Dr. Chapman, LWMC, and TFC.

81.    Additionally, BioTE expected that its Pellet Therapy program would reach – and, in fact, did reach – prescribing physicians and consumers, including its own "Trusted Providers" as well as Stacey, without any substantial change in the condition from when it was initially distributed by BioTE.

82.    At all times relevant to this Complaint, the BioTE Pellet Therapy program, and specifically, its automated online system, was defective and unsafe in design and/or implementation such that it was unreasonably dangerous to the end-user and was so at the time it was distributed by BioTE and otherwise administered to Stacey.

83.    The defective condition of BioTE's automated online system was due in part to the fact it was not equipped or otherwise programmed to provide appropriate warnings regarding unsafe and abnormally high Testosterone and Estrogen levels in its patients.

84.    This defect caused serious injuries to Stacey, who utilized the BioTE hormone therapy program in its intended and foreseeable manner.

85.    At all times relevant to this Complaint, BioTE had a duty to properly design, test, distribute, maintain, and otherwise implement proper warnings within its programs and take steps to assure that its programs did not cause users such as Stacey to suffer from unreasonable and dangerous side effects.

86.    BioTE negligently and recklessly designed, tested, distributed, maintained, and implemented its Pellet Therapy program in a manner that was dangerous and unsafe for the use and purpose for which it was intended.

11

87.     BioTE knew or should have known of the probable consequences of its aforementioned conduct, but it willfully and deliberately failed to avoid the consequences associated with its failure to warn, and acted with conscious disregard for the safety of Stacey.

88.     Stacey could not have discovered any defect in the BioTE Pellet Therapy program through the exercise of reasonable care, and she reasonably relied upon the skill, superior knowledge, and judgment of the Defendants.

89.     As a direct and proximate cause of BioTE's actions and inaction, Stacey suffered the injuries and damages as previously described herein.

90.     BioTE's conduct was willful, wanton, and displayed a level of indifference to Stacey's health and well-being such that an award of punitive damages is appropriate.

## COUNT III – STRICT PRODUCTS LIABILITY
### Plaintiffs v. BioTE

91.     Plaintiffs incorporate Paragraphs 1 through 90 as though set forth fully herein.

92.     The Pellet Therapy program manufactured, marketed, supplied, and/or distributed by BioTE was defective at the time of manufacture, development, production, testing, inspection, endorsement, sale, distribution, and in those warnings, instructions, and directions accompanying such programs failed to warn of the dangerous risks it posed.

93.     At all times relevant to this Complaint, the Pellet Therapy program manufactured, developed, endorsed, distributed, and otherwise implemented by BioTE was defective, and BioTE knew that its Pellet Therapy program was to be used by consumers without inspection for defects.

94.     The design of the BioTE Pellet Therapy program was defective in that it failed to notify and otherwise appropriately restrict the continued utilization of its Pellet Therapy when its automated online system became aware that patients such as Stacey exhibited both dangerous and abnormally high and dangerous levels of Testosterone and/or Estradiol.

12

95. The defective design of the BioTE Pellet Therapy program as described above and its associated risks did not outweigh any benefits of its design.

96. The defect in design existed when the product was first implemented by BioTE.

97. At the time the Pellet Therapy program was implemented, BioTE knew or should have known the risks associated with its defective design.

98. As a direct and proximate cause of BioTE's actions and inaction, Stacey suffered the injuries and damages as previously described herein.

99. BioTE's conduct was willful, wanton, and displayed a level of indifference to Stacey's health and well-being such that an award of punitive damages is appropriate.

### COUNT IV – MEDICAL NEGLIGENCE
### Plaintiffs v. Dr. Chapman, LWMC, and TFC

100. Plaintiffs incorporate Paragraphs 1 through 99 as though set forth fully herein.

101. Dr. Chapman owed Stacey a duty to exercise appropriate medical care and caution and to treat her in a manner consistent with the applicable standard of care.

102. Dr. Chapman breached the applicable standard of care by failing to appropriately determine Stacey's viability as a proper candidate for BioTE Pellet Therapy and by repeatedly subjecting her to the same on multiple occasions.

103. Dr. Chapman further breached the standard of care by administering Stacey numerous rounds of BioTE Pellet Therapy when Dr. Chapmen knew or should have known that her Testosterone and Estradiol levels were markedly higher than the appropriate levels for a female.

104. Dr. Chapman is personally liable for his tortious conduct.

105.    LWMC is vicariously liable for the tortious conduct of Dr. Chapman, Tina Taylor, and all other LWMC employees who treated Stacey from June 2018 through December 2018 and operated in the fashion as previously described herein.

106.    LWMC was independently negligent in allowing the BioTE hormone therapy program to operate in the fashion that it did in LWMC's facility as previously described herein.

107.    Due to LWMC's negligence and that of its employees, Stacey suffered the injuries and damages as previously described herein.

108.    The conduct of both Dr. Chapman and LWMC was willful, wanton, and displayed a level of indifference to Stacey's health and well-being such that an award of punitive damages is appropriate.

109.    Likewise, TFC is vicariously liable for the tortious conduct of Dr. Chapman, Tina Taylor, and all other TFC employees who treated Stacey from March 2019 through August 2019 and operated in the fashion as previously described above.

110.    TFC was further independently negligent in allowing the BioTE hormone therapy program to operate in the fashion that it did in TFC's facility as previously described above.

111.    Due to TFC's negligence and that of its employees, Stacey suffered the injuries and damages as previously described herein.

112.    The conduct of both Dr. Chapman and TFC was willful, wanton, and displayed a level of indifference to Stacey's health and well-being such that an award of punitive damages is appropriate.

### COUNT V – LOSS OF CONSORTIUM
### Plaintiffs v. All Defendants

113.    Plaintiffs incorporate Paragraphs 1 through 112 as though fully set forth herein.

14

114.    As a result of Stacey's injuries, Randall Jeffries has suffered a loss of services, society, comfort, and enjoyment of life.

## CONCLUSION

WHEREFORE, the Plaintiffs pray that this Honorable Court award them damages in excess of the jurisdictional minimums of this Court and in an amount sufficient to compensate them fully for their injuries as set forth herein, including an award of attorney's fees, costs, expenses, punitive damages, and such other relief as the court deems necessary.

**THE PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY.**

Respectfully submitted,

/s/ Brian J. Headley

By:    _____

Brian J. Headley, Esquire
W. Va. I.D. No. 9667
Jonathan K. Matthews, Esquire
W. Va. I.D. No. 13228
**HEADLEY BALLARD LLC**
297 Seven Farms Drive, Suite 302
Daniel Island, SC 29492
brian@headleyballard.com
Tel.: (843) 375-6181
Fax: (843) 375-6185
*Counsel for Plaintiffs*

15